## HAMBLETON & CO., INC., *v.* UNION NATIONAL BANK.

[No. 42, October Term, 1931.]

*Decided December 4th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Harry N. Baetjer* and *Hunter H. Moss,* for the appellant.

*William D. Macmillan,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

On December 6th, 1928, Hambleton & Co., Incorporated, the appellant, hereinafter called Hambleton, the Union National Bank of Pittsburgh, the appellee, hereinafter called Union or the bank, and the Baltimore Trust Company, hereinafter called the trust company, executed a written agreement, which, after reciting that: "Whereas, agreements for the purchase of seven per cent. cumulative prior preference stock of the Pittsburgh Hotels Corporation and common stock of said corporation, in units of one share of prior preference stock and one-half share of common stock, are about to be entered into between employees of Pittsburgh Hotels Corporation and Union, a true copy of the form of said purchase agreement being attached hereto and made part hereof," provided: (1) That the trust company would deliver to the bank 1,500 shares of the preferred stock of the Pittsburgh Hotels Corporation, hereinafter called the hotels company, which it held as collateral on a loan to Hambleton; (2) that Hambleton would deliver to the bank 750 shares of the common stock of that company; (3) that the bank would receive payments on such stock from employees of the hotels company purchasing the same under the form of the purchase agreement referred to in the preamble, and would remit such collections together with all dividends on the preferred stock received by it to the trust company; (4) that the bank would deliver to employees purchasing stock under such installment

purchase agreements the stock purchased by them whenever the payments made by or for such purchasers on that account to the bank plus dividends on the preferred stock paid to it were sufficient to pay for the stock purchased; (5) that "In case Union is called upon to make any payment to or to credit the account of any purchaser, or his personal representative, under the provisions of the seventh paragraph of the purchase agreement, Hambleton agrees to reimburse Union for the amount so paid or credited upon demand by Union. When so reimbursed, Union shall deliver to Baltimore, upon demand by it, certificates for the prior preference stock and to Hambleton, upon demand by it, certificates for the common stock covered by the agreement 'with the purchaser to whom, or to whose personal representative, payment has been so made. It is understood that Union shall have a lien upon any such stock immediately enforcible by public or private sale thereof, in case Hambleton should fail to reimburse it, upon demand, as above provided"; (6) that the bank was under no obligation "to terminate the right of any subscriber to continue payments or receive stock under the terms of his purchase agreement, except after written notice from Pittsburgh Hotels Corporation of the termination of his employment"; and (7) that "Hambleton agrees to indemnify Union against any liability incurred by it on account of entering into said purchase agreements except to the event of such liability arising on account of the gross negligence or wilful default of Union."

The purchase agreements, the form of which was made a part of the contract described *supra*, recited that: "Whereas, Hambleton & Company has offered to sell to the purchaser, on the terms herein mentioned, the shares of stock below set forth and in order to make more certain the carrying out of the plan for the sale of said stock, and to enable the bank to enter into and carry out the terms of this agreement, has caused delivery to be made to the bank of certificates for said stock in form for transfer," and then provided for the purchase of the stock by employees of the hotels company, the

payment of the purchase price by dividends on preferred stock and installments to be deducted ·by the hotels company from the wages of the employee and paid to the bank, for the delivery of the stock when fully paid up, that "in case the purchaser dies, or his employment by the Pittsburgh Hotels Corporation is terminated for any other reason, before he had fully paid for his stock, the bank agrees to pay to the purchaser, or to his personal representative, or other person authorized to receive payment under any present or future law of the State of Pennsylvania, on identification satisfactory to the bank, the amount of all payments on the purchase price of said stock received by it (not, however, including any dividends credited on said purchase price), with interest on each of said payments at the rate of six per cent. *per annum* from the date of the receipt thereof to the date of the termination of purchaser's employment by The Pittsburgh Hotels Corporation. After such payment has been made by the bank, or the amount due the purchaser has been credited to him by the bank, all right, title and interest of the purchaser, or of his heirs, executors, administrators or assigns, in said stock, or under this agreement, shall terminate, except the right to receive the amount so credited."

The purpose and effect of those instruments may be thus summarized: Hambleton owned a number of shares of the common and preferred stock of the Hotels Corporation and it had pledged 1,500 shares of the preferred stock as security for a loan which the trust company had made to it. It had devised a plan to sell that stock to employees of the hotels company under an agreement by which the purchase price would be paid in installments deducted from the wages of the purchasers by their employer, and by dividends on the preferred stock. To carry out that plan, the trust company agreed to deliver to the bank 1,500 shares of the preferred stock which it held as collateral, and Hambleton was to deliver to it 750 shares of common stock which it held. The bank was then to execute purchase contracts with employees of the hotels company purchasing the stock thus delivered to

it, in which it would appear as principal and vendor, and to which neither Hambleton nor the trust company would be a party.

In those stock purchase contracts, the bank agreed with employees purchasing stock under them that, in the event of the death of the purchaser, or in the event that "his employment by the Pittsburgh Hotels Corporation is terminated for any other reason," it would refund to such purchaser or his legal representative all payments made on account of the purchase price, exclusive of dividends received by it, together with interest thereon at six per cent. per annum.

After the execution of the original contract, the bank executed with a number of the employees of the hotels company agreements in the form described above for the sale of shares of the common and preferred stock of the hotels corporation to them, and the trust company and Hambleton delivered to it certificates of stock sufficient in number to permit it to perform those contracts. For a time payments were made under the purchase contracts and remitted by the bank to the trust company, and occasionally, as some purchaser died or his employment by the hotels company was terminated, a certificate to that effect from the hotels company would be presented to the bank, it would notify Hambleton, and Hambleton would furnish the money to refund the purchaser what he had paid on the purchase, together with interest, as provided in the stock purchase contracts. But when, in September, 1930, Hambleton was notified by the bank that the employment of about seventy-five of the employees of the hotels company who were bound by those stock purchase contracts had been terminated, and that those employees demanded of the bank a refund of payments made on account of the stock respectively purchased by them with interest thereon, it wrote the bank as follows:

> "We have made an investigation of the books of the Pittsburgh Hotels Corporation and find that with the exception of only a few employees, all of those who have demanded a refund of the amounts paid by them on the ground that their employment by the Hotels

324

Corporation had terminated, were out of such employment in most cases for not more than two days and in no case for more than a week. The agreement certainly never contemplated the return of the fund on account of temporary suspension of employment, particularly when as in this case, the claim for the refund must be based upon collusive discharge of the employee. We are unwilling, therefore, to honor the claims for the refund unless we are furnished with satisfactory evidence over the signature of the president or vice-president of the hotel that the man who is making the claim has been discharged permanently and will not be re-employed by the Hotels Corporation at least for a period of one year."

On September 10th the bank in answer to that letter wrote:
"Until advised by counsel to the contrary, we will exercise all reasonable care in complying with your stipulation, but inasmuch as the Stock Purchase Agreements between this bank and the various employees specify the conditions under which refunds are to be made, we are apprehensive that some employees may seek to hold this bank liable for breach of contract. Therefore, we should like to have an official communication from your company undertaking to indemnify and protect The Union National Bank of Pittsburgh from any and all liability and expense which may arise from our insistence upon compliance with the conditions imposed by your letter of September 9, 1930."

On September 11th, further answering Hambleton's letter, the bank wrote:
"This is in further reference to your letter of September 9, 1930, regarding the Pittsburgh Hotels Corporation Employees' Stock Purchase Plan. Upon further consideration of the agreement between your company, Baltimore Trust Company and this bank and the agreement between this bank and the employees, it is our opinion that the conditions imposed in your letter

are incompatible with the terms of the above-mentioned agreements and, therefore, we must decline to undertake to carry out such conditions. We feel that insistence upon such conditions may involve this bank in serious liability to the respective employees on account of breach of contract under the Stock Purchase Agreements.

"Therefore, you will kindly accept this as formal notice.

"(a) That we hold in our files official certificates from the Pittsburgh Hotels Corporation indicating that the employment of each person listed in our letters of September 4th and 5th and in our two letters of September 8th has terminated and that his or her subscription contract is no longer in force so that each employee is entitled to a refund of the payments made, together with interest thereon as specified in the Stock Purchase Agreement;

"(b) That we ask your company to make remittance promptly of the money necessary to make the refunds described in our said letters;

"(c) That we will look to your company to indemnify this bank against any expense or liability incurred on account of your delay in providing funds to meet said refunds."

In reply to that letter, Hambleton & Co. on September 15th wrote the bank:

"We regret extremely that you as a third party to the transaction, as it were, may be subjected to any annoyance in the matter. Although we recognize the import of the strict wording of the contract with the employee, it is not conceivable in our opinion that the paper could be so construed as to permit the employee in collusion with the management to get back the money on the ground that they were discharged when as a matter of fact their employment was temporarily suspended only and that for the express purpose of enabling them to get the refund.

"We must, therefore, maintain the position set out in our letter to you of September 9th.

"If any of the employees in question recover in a proceeding against you, we would, of course, expect to reimburse you the amount that you pay and your expenses in the matter, provided, of course, that we were given an opportunity to appear and defend the suit."

Following that correspondence, on September 19th, 1930, the bank refunded to the employees named in a list sent to Hambleton payments made by them under the stock purchase agreements, aggregating $11,370.50, and by its letter of that date it notified Hambleton that such refunds had been made in accordance with certificates from the hotels company certifying that the employment of such purchasers by the hotels company had been terminated; that, as a consequence of that termination, the stock purchase agreements had also by their terms been canceled; that under section seven of such agreements the bank was obliged to make such refunds; and it demanded that Hambleton reimburse it for the amount which it has thus paid out. Hambleton refused to comply with that demand, and on December 19th, 1930, the bank brought this action in the Superior Court of Baltimore City against Hambleton. The case was tried before the court sitting as a jury, and, the verdict and judgment being for the plaintiff, the defendant took this appeal.

The plaintiff asked for no instructions, and, as the five prayers offered by the defendant were all refused, the court took the case for determination upon the pleadings and evidence without instructions of any kind.

Its action in refusing the defendant's prayers is the subject of the first of the two exceptions submitted by the record, and its failure to formulate of its own motion and for its own guidance proper instructions is the subject of the second, and these two exceptions will be considered in inverse order.

The long-settled and establshed practice in this state in respect to instructing the jury, or the court sitting as a jury, in law cases, as to the law applicable to the facts, is that each

party submits in writing for the consideration and action of the court his contentions as to the law of the case, and in so far as the propositions embodying those contentions are applicable to the facts, an accurate exposition of the law, and necessary for the adequate and proper instruction of the jury, it is the duty of the court to grant them. They are called indifferently prayers, or instructions, but however entitled, when granted, they become the instructions of the court, and, as such, are binding upon the jury or the court sitting as a jury. The court is authorized, and it is its duty, to reject all instructions which fail to state the law properly, are inapplicable to the facts, are likely to confuse or mislead the jury, or are unnecessary. It may for those reasons or any of them reject all prayers, nor in such event is it required to formulate and adopt instructions of its own, even though the jury or the court sitting as a jury is, as a result of the court's action and the failure of the parties to submit proper instructions, wholly uninstructed as to the law of the case. It may, however, at its discretion, and the better practice is that it should under such circumstances, instruct the jury as to the law, but it is not bound to do so, and its failure to do so does not constitute error. If it does *ex mero motu* instruct the jury, or itself sitting as a jury, as to the law of the case either orally or in writing, the propriety of its instructions will be measured by the same standards as those applicable to instructions submitted by the parties. *Keener v. Harrod,* 2 Md. 63; *Coates v. Sangston,* 5 Md. 133; *Garvey v. Wayson,* 42 Md. 188.

Rule 31 of the Supreme Bench of Baltimore, upon which appellant relies in support of the objection submitted by that exception, assuming it to be as stated in appellant's brief, is in no sense in conflict with that practice. The particular sentence in that rule to which the attention of this court has been directed, that "the court upon the whole case will give such instructions as may appear requisite to place the case fully before the jury," refers to the action of the court upon prayers furnished by the parties, as required by other language of the rule, and was obviously from its context, as

well as from the language of the sentence itself, not intended as a mandate to the court, in the absence of other instructions, to formulate its own instructions to the jury, much less to formulate instructions to itself sitting as a jury. It follows that the second exception involves no error on the part of the trial court.

The defendant's A prayer was a demurrer to the evidence and was refused by the court. The exception to that ruling was not pressed in this court, and as to it it is sufficient to say that an examination of the record leaves no doubt as to its propriety.

The defendant's third and fourth prayers were also properly refused. They in effect stated that, if the plaintiff made the repayments to "the employees involved in the case under the stock purchase agreements" after it had been "notified" by the defendant that the employment of such employees by the hotels company had not been permanently terminated, and that it, the defendant, would not reimburse the plaintiff for such payments, the plaintiff was not entitled to recover. The vice of that proposition is that it made mere notice by the defendant conclusive of the fact that the employment had not been terminated, instead of leaving that fact to be determined by the court sitting as a jury. For whether the employment had been terminated was a question of fact for the court sitting as a jury, and not for the defendant to determine.

The vital question in the case, however, is presented by the refusal of the defendant's first and second prayers. By its first prayer, it prayed the court to instruct itself sitting as a jury that if it found that "the employment by the Pittsburgh Hotels Corporation of its employees involved in this case was not permanently terminated, but was merely temporarily suspended, before the plaintiff made the repayments under the stock purchase agreements admitted in evidence, and that the plaintiff had knowledge of this at the time the repayments were made, then such repayments constituted either gross negligence or wilful default on the part of the plaintiff under the terms of the contracts admitted in evi-

dence, and the plaintiff is not entitled to recover from the defendant." The second prayer differed from the first in that it predicated a finding for the defendant on an additional fact, to wit, that defendant had notified plaintiff before it made such repayments that it would not reimburse it. These prayers should have been granted. The real issue in the case was whether the employment by the hotels company of the employees to whom the bank made the refunds which it seeks to recover in this case had been terminated before such refunds were made. If they had not been so terminated, then, under the contract between Hambleton, the bank, and the trust company, the bank was not entitled to recover. Whether they had been so terminated was a question for the court sitting as a jury to determine as a matter of fact, and not for the court to determine as a matter of law. It was for the court to say what the word "terminated" as used in the stock purchase contracts meant, but it was for the jury or the court sitting as a jury to say as a matter of fact from the evidence whether the employment was terminated within that meaning. The prayers qualified the word "terminated" by the word "permanently" which does not appear in the contract, but that qualification added nothing to the significance of the term, for it in itself implies permanency in the sense of finality or completeness, and it is highly improbable that the court would have been misled by the qualification. If the employment was in fact terminated, then by the very force of the term it was at an end. The employee might be re-employed at some future time, but in such a case he would be re-employed under a new contract and not under the contract which had been terminated. In such a case, the employments would be successive and not continuous, and under distinct contracts each complete in itself. And that distinction is made manifest in the prayer by the use of the phrase "temporarily suspended" as the antithesis of "terminated." The duration of the period intervening between the termination of a term of employment under one contract, and the beginning of a term of employment under another, is a material fact to consider in deter-

mining whether the first term was in fact terminated or merely suspended, but is in no sense conclusive of that question.

The prayers further state that if the bank made the refunds before the employment of the employees to whom they were made had been terminated, such repayments constituted either gross negligence or willful default, and that therefore it would not be entitled to recover such repayments in this case, and, in connection with that expression as used in the contracts and in the prayers, counsel have dealt with the questions of negligence and default as though the case turned upon the general principles of the law of agency. But no such principles are involved in this case. For here the rights of the parties have been definitely and clearly fixed by the contracts which they made, and it is not permissible to go beyond those contracts to ascertain them. The expression "gross negligence and wilful default," as used in the contract between the parties to this appeal, does not appear to refer to the repayment of money paid under the stock purchase contracts, for that is the subject of a special clause in the contract, but to default or negligence by the bank in the general performance of its duties under the contract. But no such negligence or default is involved in this case, for, by the explicit terms of the contract, Hambleton was not bound to reimburse the bank for repayments unless made under the provisions of the seventh paragraph of the purchase agreements. And under that paragraph the bank was not authorized to make such refunds unless and until the employment of the purchaser by the hotels company had been terminated. So that the right of the plaintiff to recover depended not upon any question of negligence or default, but upon the single issue of whether, when the repayments were made, such employment had been terminated. But at most, the use of that expression in the prayers was a mere characterization of the act of the bank in making such repayments prior to the termination of the employment, and it could not possibly affect the soundness of the proposition plainly submitted by the prayers that the plaintiff was not

entitled to recover refunds made by it, if at the time it made them the employment by the hotels company of the purchasers to whom such refunds were made had not been terminated.

There was therefore error in the refusal of these prayers, but, as the error would not have been injurious if there was in the case no evidence legally sufficient to support any hypothesis other than that the employment was terminated, it will be necessary to refer to the evidence relating to that issue.

In addition to the facts already stated, which were uncontradicted, there was evidence tending to prove that of the seventy-five employees whose stock purchase contracts are involved in this case, sixty-six returned to work for the hotels company on the second day after the supposed termination of their employment, four on the third day, two on the fourth day, one on the sixth day, one on the seventh day, and one on the eighth day; that in each case the employee whose employment was terminated was paid up to that time; that in every case their employment was terminated and they were re-employed between August 17th and September 30, 1930; that the secretary of the hotels company had no personal knowledge that they were told before they left that they would be re-employed; nor that if they terminated their employment they could not demand back the money they had paid for the stock. But, after saying that, he gave this testimony:

"Q. Did you tell them they could get their jobs back? A. No one was specifically told that by me. But there were only a few I talked to, probably two or three per cent. I talked to.

"Q. Mr. Pettis, were any instructions given by you to your subordinates to tell the Pittsburgh Hotel employees that if they terminated their employment in order they might collect this money, that they would be re-employed? A. There were no such general instructions issued. Quite a number of employees had quit before and gotten their money back and gotten their jobs back.

"Q. Did these people just do that of their own volition without anybody in the Pittsburgh Hotels Corporation, acting under your instructions, telling them that they could get their money back? A. I have got to give a little more of the history to answer that question. The dividend on this stock was passed in July, 1930. Dividends had been paid quarterly on it up to that time. When that word got out, the employees started acting—they had the stock—they started becoming very nervous, and some of them in the accounting department knew the situation and started looking around, and became continually more restless, and wanted to know about their stock and what they could do. How could they get their money back? They were so told the only way they could get it back was to quit working for the Pittsburgh Hotels Corporation.

"Q. Now Mr. Pettis, take a man—the first name on this list, Valentine Bopp, he had made a payment of $84. Do you know how much Valentine Bopp got per week? A. No, I don't.

"Q. Now, Valentine Bopp, then in order to collect $84.00, had to give up what was, as far as anyone knew, a permanent job, isn't that right? A. That's correct.

"Q. Do you happen to know what job Valentine Bopp had? A. No, I don't. But from the name I take it he was probably in the kitchen department, or waiter, probably getting forty or fifty dollars a month.

"Q. Then Mr. Stafford, one of the auditors, also got his back, and came back in the employment of the hotel? A. Yes."

Viewing that evidence in the light most favorable to the defendant, as we are required to do in dealing with those prayers, it permits the inference that the cessation of the employment of the purchasers by the hotels company was a mere device to enable them to avoid their contracts, by complying with the letter of such contracts as they read them, without any intention of actually terminating the employment at all. But the word terminated as used in those contracts cannot be so construed. On the contrary, the obvious

purpose and intention of the parties to the contract in using it coincided with its actual and ordinary meaning, which was that the purchasers would not be entitled to a refund until their employment by the hotels company was at an end. The motive for terminating it was not material, but it was essential that it should be in fact terminated, and the mere fact that the purchasers ceased to serve and draw wages for two or three or even seven days was not a termination of the employment if it was understood when they left that they were to return and continue in the service as before. Nor was there anything, in either the form of the stock purchase agreements or the contract between Hambleton, the bank, and the trust company, which made the certificate of the hotels conclusive evidence of the termination of the employment of the purchasers by the hotels company; but that question was left to be determined according to the facts and circumstances of each case in which it arose. For those reasons there was, in the opinion of this court, evidence legally sufficient to support the hypothesis that the employment of the purchasers by the hotels company had not been terminated when the appellee made the payments which it seeks to recover in this case, and the appellant was prejudiced by the ruling of the court refusing these prayers, which is the subject of the second exception. It will therefore be necessary to reverse the judgment appealed from, and remand the case for a new trial.

*Judgment reversed, and cause remanded, with costs to the appellant.*